THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAM R. MITCHELL, Defendant-Appellant.

(No. 55732;

First District—January 26, 1973.

James J. Doherty, Public Defender, of Chicago, (Robert M. Gray, Assistant Public Defender, of counsel,) for appellant.

Bernard Carey, State's Attorney, of Chicago, (Elmer C. Kissane and James Carlson, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendant Sam R. Mitchell was indicted for murder and after a bench trial was found guilty only of the lesser included offense of involuntary manslaughter pursuant to Ill. Rev. Stat. 1969, ch. 38, sec. 9-3(a). He was

sentenced to a term of one to five years. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt.

Although other witnesses also testified at trial, the testimony of eight occurrence witnesses, including defendant, is particularly relevant. Their testimony regarding the circumstances immediately preceding the incident substantially agrees and may be summarized as follows. On the night of February 21, 1970, defendant attended a party where he gambled with some other guests in the basement. After losing his money defendant left but soon returned with his gun which he wanted to pawn or sell to continue gambling. After discussing the sale of the gun with Clyde Pruitt, defendant pawned the gun with Clarence Dale, the deceased. The gun was unloaded when defendant gave it to Dale; but when Dale complained that a gun is worthless without bullets, defendant handed him the bullets. Defendant then resumed gambling and Dale went upstairs but later returned to the basement. Sometime later a dispute arose among the gamblers because James Levy refused to pay after losing a bet. Soon thereafter defendant asked Dale to return his gun and tendered some money, but Dale refused to turn over the gun.

The witnesses differ considerably regarding what happened after Clarence Dale refused to return defendant's gun. Although these differences will be discussed below, certain facts are clear from the record. Clarence Dale was intoxicated at the time of the incident. After Dale refused to return the gun, he and defendant began struggling and fell onto a cot which was located in the basement. Dale was lying face up across the cot and defendant was on top of Dale. During this time the gun fell to the floor. Defendant picked up the gun with his left hand and transferred it to his right hand. The gun then discharged, killing Dale.

According to Ollie Mae Thomas, the State's first witness and a close friend of Dale's wife, defendant gave Dale only part of the money he owed on the gun. Defendant began pushing and arguing with Dale and pushed him down onto the cot. Defendant then began choking Dale and would have hit him had she not yelled. When defendant picked up the gun, he said he was going to kill Dale and put the gun to Dale's left temple before pulling the trigger. Dale said and did nothing during this time. And before leaving, defendant took the money he had given Dale from Dale's shirt pocket and, after pointing the gun at James Levy, took some money from him.

According to Perry Parker, the State's second witness, the gun fell to the floor before defendant and Dale fell onto the cot. Although the witness was leaving, he did not hear defendant say he was going to kill Dale nor did he hear Mrs. Thomas say anything to Dale.

Clyde Pruitt, the State's third witness, was not sure whether defendant and Dale were fighting or playing; but when they fell onto the cot, they were wrestling. Like Parker, this witness did not hear defendant say anything to Dale other than asking for his gun, nor did he hear Mrs. Thomas say anything to defendant.

Houston Washington, another State's witness, testified that although he had originally told the police he was not present because Mrs. Thomas had asked him to do so, he had actually been asleep on the cot when the struggle between defendant and Dale began. When he awoke, he saw defendant holding Dale by the throat. The witness moved when defendant and Dale fell onto the cot, but stayed nearby because he did not think the struggle was in earnest. When defendant and Dale fell onto the cot, Dale acted as if he were handicapped, and defendant twisted him over so that he could reach the gun. After picking up the gun, defendant put it to Dale's right temple and, without saying anything, pulled the trigger. Before leaving, defendant pointed his gun at James Levy and took some money from him.

According to J. B. Jones, the State's last occurrence witness, defendant did not tender all the money he owed Dale for the gun and tried to take the gun by force. Defendant was yelling at Dale demanding the gun when they began wrestling. After they fell onto the cot defendant began shaking Dale until the gun fell onto the floor; Dale then stopped struggling. After picking up the gun defendant said he was going to kill Dale. He put the gun to Dale's head, and shot him. Before leaving defendant demanded money from James Levy.

According to Dr. Jerry Kearns, the pathologist who testified for the State, Dale was shot in the left forehead and the wound was most likely not a contact wound.

Frank Hunt, the first defense occurrence witness, stated that J. B. Jones was not present at the time of the incident. He testified that defendant tendered the full amount he had borrowed from Dale, but Dale also wanted to be paid for another debt. Defendant and Dale began wrestling, but nobody paid any attention to them because they were friends and because another struggle, with James Levy, was in progress. Just before the shot was fired, the witness saw defendant attempting to hit Dale and saw Dale defending himself. Before leaving, defendant did not approach or talk to James Levy.

The second defense witness, James Levy, testified that although he did not remember everything because he was drinking, defendant did not point a gun at him or take any money from him.

Defendant, testifying on his own behalf, also stated that J. B. Jones

was not present at the time of the shooting. According to defendant, when the dispute with Levy began, he handed his friend Clarence Dale the money he owed for the gun and put his coat on to leave; but Dale, claiming defendant owed him for another debt, threw the money on the table. Defendant picked up the money and put it in Dale's shirt pocket. Dale then grabbed defendant's wrist and defendant, trying to pull away without letting Dale fall, put his hand on Dale's shoulders. Despite defendant's efforts, Dale pulled them toward the cot and they slipped onto it. Defendant tried to retrieve his gun from Dale's pocket while Dale struggled to prevent him from doing so and the gun fell onto the floor. After picking up the gun, defendant transferred it to his right hand to put it into his coat pocket. Dale, who was holding onto defendant's coat, grabbed the gun before defendant could put it in his pocket. The gun, which defendant thought was still unloaded, then accidentally discharged, killing Dale. Defendant, in shock, left immediately.

After hearing the evidence, the court observed that the testimony that defendant stated he was going to kill Dale and actually put the gun in contact with Dale's head was not credible. Furthermore, it observed that the struggle between defendant and Dale aroused no passion. Therefore, the court concluded, defendant was not guilty of murder or voluntary manslaughter. However, the court concluded "that the defendant * * * precipitated the struggle" and that "defendant was the aggressor." It further concluded that defendant knew the deceased was intoxicated and failed to withdraw upon retrieving the gun. The court also stated that the defendant did not know whether the gun was loaded, "but he did not know also that the gun was not loaded. Therefore, the gun could have been loaded." The court, apparently disbelieving the defendant's defense of accident or death by misadventure, determined that defendant had acted recklessly and therefore was guilty of involuntary manslaughter. The court made no specific statement regarding whether he believed deceased had attempted to grab the gun.

OPINION

■■ Defendant's first and only contention is that he was not proved guilty beyond a reasonable doubt. Essentially, he argues that although he may have been negligent, he was not reckless as required for a conviction of involuntary manslaughter. Sections 4-6 and 4-7 of the Illinois Criminal Code define the mental states of recklessness and negligence respectively. The difference between these mental states is two-fold. First, recklessness requires the conscious disregard of a substantial and unjustifiable risk that circumstances exist or that a result will follow; but negligence requires only a lack of awareness of such a risk. Second, reck-

lessness requires gross deviation from the standard of care which a reasonable man would exercise in the situation; but negligence requires only substantial deviation from that standard. Comment to sec. 4-3, Smith-Hurd Ann., 1972, ch. 38, sec. 4-3, at 261.

■■ Normally, questions of the credibility of witnesses and of the weight and sufficiency of evidence are for the trier of fact and a reviewing court will not substitute its judgment. However, in support of his contention, defendant cites *People v. Oberlin* (1934), 355 Ill. 317, 189 N.E. 333, where the Illinois Supreme Court reversed a conviction for involuntary manslaughter because defendant was not proved guilty beyond a reasonable doubt. In that case, the testimony of the defendant and his father, the only two occurrence witnesses, substantially agreed. After she heard a shot, rushed into the room, and saw her husband with a gun, defendant's wife grabbed the gun, but when she slipped the gun discharged resulting in her death. The court observed that powder burns and a wound of entry were found on Mrs. Oberlin's hand, that no motive for murder was proved, and that nothing was improbable about defendant's or his father's testimony. Therefore, although defendant may have been negligent, he was not grossly and wantonly negligent as required to be found guilty of involuntary manslaughter.

Although the line between recklessness and negligence is sometimes hard to define, it appears that the facts in the instant case are different from those in *Oberlin*. In that case, the testimony of the only two occurrence witnesses agreed and the deceased, who was conscious for several days, said nothing to dispute defendant's theory of the case. Moreover, the testimony clearly indicated that the deceased grabbed defendant's gun and that defendant did everything he could to help after the incident. In the instant case, the testimony of the eight occurrence witnesses was extremely divergent, with three witnesses, although not totally credible, testifying that defendant had intentionally put the gun to deceased's head before pulling the trigger. Moreover, only defendant's testimony supported the conclusion that deceased grabbed the gun.

■■ A gun is a deadly weapon capable of killing another. Numerous Illinois cases, including *People v. Thomas* (1971), 1 Ill.App.3d 139, 275 N.E.2d 253, and *People v. Reece* (1970), 123 Ill.App.2d 97, 259 N.E.2d 619, indicate that handling a gun improperly may be reckless conduct. Here, defendant initiated a struggle over a gun with an armed and intoxicated man. Defendant, the court found, was the aggressor. He knew the deceased was intoxicated. He knew the deceased had a gun. He knew the deceased had the bullets for the gun. He knew the deceased had said a gun is of no value without bullets and therefore might load the gun. Nonetheless, defendant acted. Defendant consciously took the gun

out of deceased's pocket. He consciously transferred the gun from his left to his right hand instead of withdrawing. On these facts, we agree with the trial court that defendant acted recklessly. Therefore, the decision of the trial court is affirmed.

Affirmed.

DRUCKER, P. J., and ENGLISH, J., concur.